UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROLLERI & SHEPPARD CPAS, LLP, et al., <br>     *Plaintiffs*, <br><br> v. <br><br> MICHAEL J. KNIGHT and DARLENE M. KNIGHT., <br>     *Defendants*. | 3:22-CV-1269 (OAW) |

## OMNIBUS ORDER

**THIS ACTION** is before the court upon Plaintiffs' Motion for Prejudgment Remedy ("PJR Motion"), ECF No. 17; Defendants' Motion to Dismiss ("MTD"), ECF Nos. 34 and 41;[1] and Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion"), ECF No. 66.  The court has reviewed all the motions, the opposition to the MTD, ECF No. 47, the objections to the TRO Motion, ECF Nos. 69 and 70, and the record in this case, and is thoroughly advised in the premises.  The court held a hearing on the PJR Motion and the MTD on December 13, 2022 (and on December 19, 2022).[2] For the reasons discussed herein, the PJR Motion hereby is **DENIED;** the MTD is **DENIED in part and GRANTED in part;** and the TRO Motion is **DENIED.**

---

[1] Defendant Darlene Knight filed the first motion to dismiss, ECF No. 34, and Defendant Michael Knight later joined in the motion, ECF No. 41.  Defendant Michael Knight's motion simply adopts the arguments presented in Defendant Darlene Knight's motion, and so the court will treat both motions as one.
[2] The hearing also addressed pending motions in the related case *Knight v. Rolleri, et al.,* case no. 3:22-cv-1482 (OAW).

1

I. **BACKGROUND**

Plaintiff Rolleri & Sheppard CPAs, LLP (the "Rolleri Firm"), used to be a firm named Knight Rolleri Sheppard CPAs, LLP (the "Knight Firm").[3]  ECF No. 13 at ¶ 1.  Plaintiffs John Rolleri and Ryan Sheppard were partners in that firm, along with Defendant Michael Knight.  ECF No. 17-1 at ¶¶ 4, 6, 11–13.  Defendant Darlene Knight is Michael Knight's wife.  ECF No. 13 at ¶ 3.  Mrs. Knight also was an employee of the firm.[4]  Both defendants were trustees and fiduciaries of the firm's Cash Balance Plan (the "Plan"), a retirement fund.  *Id.* at ¶ 7.

According to Plaintiffs, Mr. Knight was nearing retirement in December 2021, and at that time he was informed that his maximum distribution from the Plan was approximately $2.8 million.[5]  *Id.* at ¶ 9(c).  He received this amount in December 2021.  ECF No. 17-1 at ¶ 6.  He signed a document acknowledging that this amount was his full payment under the Plan.  *Id.*

According to an exhibit attached to the complaint, in January 2022, approximately $695,000 in securities were transferred to Mr. Knight's personal retirement account and $613,000 in securities were transferred to Mrs. Knight's Individual Retirement Account.  ECF No. 13-1.  In February 2022, $3,779 in securities were transferred to Mrs. Knight's IRA.  *Id.*  In March 2022, Mr. Knight transferred to his IRA[6] an interest in Five Guys

---

[3] There is an argument that it is still Knight Rolleri Sheppard CPAS, LLP.
[4] At the hearing, testimony was presented that established that Mrs. Knight had been employed at the Knight Firm and had retired prior to the events at issue in this action.
[5] The maximum permissible benefit is determined by statute and related regulations, *see* 26 U.S.C. § 415; 26 C.F.R. § 1.415(b)-1, and it is periodically increased, *see* 26 U.S.C. § 415; 26 C.F.R. § 1.415(b)-1. Actuarial and accounting calculations are required to determine the exact dollar amount, particularly when the benefit is taken as a lump sum instead of an annuity.  *See* Cash Balance Pension Plans, 1996-1 C.B. 359 (1996).  Mr. Rolleri testified that this number was calculated by the Knight Firm's pension consultant. The pension consultant did testify at the hearing, but did not testify to the specifics of this calculation.
[6] The exhibit is confusing on this point.  It may be that the funds were transferred to Mrs. Knight's IRA.

Investments, LLC, which was worth about $168,000 at transfer, and which interest was held by the Plan but which funds were under Mr. Knight's control. *Id.*; *see also* ECF No. 13 at ¶ 9(d). And in July 2022, a little more than $550 was transferred to Mrs. Knight's IRA. *Id.* Plaintiffs assert that these transfers were all unlawful and that Defendants concealed the transfers from the other partners. The total amount unlawfully transferred is alleged to be approximately $1.4 million.[7]

Plaintiffs assert two claims against Defendants: breach of fiduciary duty, and civil theft. ECF No. 1. They have filed a motion seeking a prejudgment remedy in the amount of $4,630,773.57 which purportedly represents treble damages, and $64,871.98 of interest. ECF No. 17.

## II. LEGAL STANDARD

### A. Prejudgment Remedy

A prejudgment remedy is a mechanism for a litigant (at the outset of a case) to ensure satisfaction of any judgment which eventually might be entered in their favor. *Cendant Corp. v. Shelton*, No. CIV.A. 3-06-CV-854JC, 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007). Federal Rule of Civil Procedure 64 states that prejudgment remedies available under a state's laws also are available in the federal courts within that state. Fed. R. Civ. P. 64(a). Connecticut provides for a prejudgment remedy where certain prerequisites are satisfied. Conn. Gen. Stat. § 52-278a et seq. Accordingly, the prejudgment remedy also is available in this federal district.

---

[7] The complaint also took issue with the slight excess Mr. Knight received in December 2021 because he was taking assets in kind (that is, as securities) instead of liquidating the securities and taking his payout as cash. At the hearing, though, Mr. Rolleri indicated that that amount was no longer a subject of dispute.

3

Connecticut law generally requires that a hearing must be held before a court, and that the court must consider all the facts before it, and take into account any defenses, counterclaims, set-offs, and claims of exemption (or adequate insurance). *Id.* A court may grant a prejudgment remedy if, after affording the defendant an opportunity to be heard, the court "finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted . . . ." *Id.* However, the hearing is not intended to be a full-scale trial on the merits. It is held merely to determine whether there is probable cause to believe that judgment will be entered in a litigant's favor, and in the amount they seek. *Kenwell Trading Ltd. v. Porcelen Ltd. CT LLC*, No. 3:22-CV-00248 (KAD), 2022 WL 3359159, at *1 (D. Conn. Aug. 15, 2022). For purposes of a prejudgment remedy, "probable cause" is "[a] bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it . . . ." *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 421 (D. Conn. 2013) (quoting *Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F.Supp.2d 247, 249 (D.Conn.2002)).

### B. **Motion to Dismiss**

It is axiomatic that federal courts have limited jurisdiction, and that an action must be dismissed where such jurisdiction is lacking. *See Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d. Cir. 2011). "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002). "Standing is an essential component of subject matter

4

jurisdiction." *Gosain v. Texplas India Priv. Ltd.*, 393 F. Supp. 3d 368, 374 (S.D.N.Y. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### C. Temporary Restraining Order/Preliminary Injunction

In order to obtain a temporary restraining order or a preliminary injunction, a movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Sunbelt Rentals, Inc. v. McAndrews>*, 552 F. Supp. 3d 319, 325 (D. Conn. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, (Mem)–26 (2d Cir. 2018) (quoting *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007)) (per curiam) (alteration and emphasis in original).

### III. DISCUSSION

Cash balance plans will be explained (briefly) before the court reaches the merits of the aforementioned motions.

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., created a tax-deferred mechanism for employee retirement savings. ERISA basically explains: **defined *contribution*** or "individual account" retirement plans (such as 401(k) plans) are based solely upon contributions to a participant employee's account,

whereas **defined *benefit* plans** are pension plans *other* than the defined *contribution* (individual account) plans.  29 U.S.C. § 1002 at (34)–(35).

A **cash balance plan** is a "form of plan intended to combine attributes of both defined contribution and defined benefit plans."  *Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents*, 533 F.3d 102, 105 (2d Cir. 2008).

> Under a cash balance pension plan, a hypothetical account is established in each participant's name. Benefits are credited to that "account" over time, driven by two variables: (1) the employer's hypothetical "contributions," and (2) hypothetical earnings expressed as interest credits. Employer "contributions" are usually expressed as a percentage of salary, the rate of which may vary with employee tenure. Interest credits may be at a fixed interest rate, but more often they are tied to an extrinsic index—for example, U.S. Government securities of a specified maturity—and they vary accordingly. Each year an employee receives a statement of her "account" balance, and can therefore see the value of her pension benefit.

*Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir.2000).

It is important to recognize that in a cash balance plan, individual accounts are mere recordkeeping tools to track what benefit is due an employee; employers do not actually deposit funds into individual employees' cash balance accounts.  *Hirt*, 533 F.3d at 105.  It also is important to note that all contributions to a cash balance plan are *employer* contributions.  *Id.*  Thus, the assets in a cash balance plan, while earmarked for certain employees pursuant to the terms of the plan documents, are the plan's assets.

There are certain background facts and features of ERISA and the Plan that are relevant to the claims and defenses in this action.  Where applicable, the court will describe them, below.  And because subject matter jurisdiction is dispositive of whether the court can rule on the other motions, the court begins with the MTD.

6

### A. <u>Motion to Dismiss</u>

Defendants argue that all the Plaintiffs lack standing to bring this action. With respect to the Rolleri Firm, they assert that "Rolleri & Sheppard CPAS, LLP" does not exist as a legal entity because although Mr. Rolleri and Mr. Sheppard purport to have expelled Mr. Knight from the firm, that expulsion is not effective under Connecticut law. And with respect to Mr. Rolleri and Mr. Sheppard, Defendants assert that the Plan actually belongs to the Knight Firm, and the individual Plaintiffs, being limited partners in the Knight Firm, must seek recourse in a derivative action, but neither have suffered a particularized injury sufficient to sustain a derivative action.

#### 1. *The Rolleri Firm's Standing*

With respect to the Rolleri Firm's standing, Plaintiffs counter that Mr. Knight's expulsion was proper under Connecticut law, which allows dissociation of a partner upon the unanimous vote of all other partners if it is unlawful to carry on the partnership's business with that partner. Conn. Gen. Stat. § 34-355(4)(A). Plaintiffs assert that Mr. Knight committed "substantive federal and state crimes," which the court presumes is a reference to the alleged theft of money from the Plan. ECF No. 42 at 3. Plaintiffs contend that, consequently, continued alliance with Mr. Knight could have exposed the firm and the individual partners to "accusations of ratification of" those alleged criminal acts. *Id.*

As a preliminary matter, and as will be discussed more fully infra, the criminality of Mr. Knight's actions is by no means clear. But even setting aside this fact, the court finds that this argument fails because there is no indication that it would have been unlawful for the firm to continue to operate with Mr. Knight as a partner. In support of their contention that continued operation of the Knight Firm would have been unlawful,

7

Plaintiffs only reference Section 20-281h of the General Statutes of Connecticut, which allows criminal sanctions for individuals or firms who violate Conn. Gen. Stat. § 20-281g. However, Section 20-281g, criminalizes people or firms operating as public accountants without a valid license. There is no allegation in the record that Mr. Knight ever violated that statute. It appears that his license remained active until his ouster. Accordingly, Plaintiffs have failed to show that continued operation of the Knight Firm would have been unlawful, and consequently they have failed to show that their attempted dissociation of Mr. Knight was proper under Connecticut law. The court therefore cannot conclude, based on this record, that the Rolleri Firm exists as a legal entity. The MTD therefore is granted with respect to the Rolleri Firm.

### 2. *Mr. Rolleri's and Mr. Sheppard's Standing*

With respect to the individual Plaintiffs' standing, Plaintiffs argue that Mr. Rolleri and Mr. Sheppard are not bringing this action as individuals, but as trustees of the plan, and that their claims therefore are not derivative. They cite no authority in support of this argument, and Defendants do not reply to this argument.

Given the court's conclusion that the Rolleri Firm is not a legal entity under Connecticut law, the rights and relationships to the Plan become somewhat murky; it is unclear whether the Plan's purported transfer to the Rolleri Firm was valid. However, the court need not untangle the issue, because it also is undisputed (in either case) that Messrs. Rolleri and Sheppard are trustees and fiduciaries of the Plan, and thus they have standing under ERISA[8] to bring suit pursuant to 29 U.S.C.A. § 1132(a)(2)–(3). The MTD therefore is denied as to Mr. Rolleri and Mr. Sheppard.

---

[8] The court notes that ERISA fully preempts all state law, *see* 29 U.S.C. § 1144(a), and it is not entirely clear whether this preemption is fatal as to Count Two, the claim for civil theft, which is a state law claim.

### B. PJR Motion

The court now turns to the question of a prejudgment remedy. Plaintiffs assert that they have carried their burden of showing probable cause, relying largely upon an affidavit submitted by Mr. Rolleri and Mr. Rolleri's oral testimony. In his affidavit, Mr. Rolleri attests the following relevant facts: (1) Mr. Knight stole $1.6 million from the Plan, and (2) both Defendants were silent about their improper withdrawals of money.

This affidavit, though, does not tell the full story. Mr. Rolleri testified before the court that the Plan encompassed multiple custodial accounts, several of which were under Mr. Knight's control, and although all contributions to the Plan technically were employer contributions (and technically were Plan assets), the funds contained in Mr. Knight's custodial accounts were contributions made by Mr. Knight alone, with his own personal money.[9] Mr. Knight, in turn, testified that in December 2021, there was over $4 million in his cash balance account,[10] and upon learning at that time that his account was overfunded, he sought the pension consultant's advice on how he might recover the full amount in his account. All the withdrawals he made in 2022 purportedly followed that advice, with knowledge to Plaintiffs.[11] Thus, Mr. Knight asserts, all the assets he withdrew were his assets.

---

*See LoPresti v.* Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (finding a common law conversion claim to recover a plan's losses was "nothing more than an 'alternative theory of recovery for conduct actionable under ERISA,'" that was preempted.) (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 288 (2d Cir.1992)). However, the parties do not argue this issue and so the court will not address it.

[9] There was no further explanation of how contributions of Mr. Knight's personal funds constitute employer contributions, but the court presumes that it is due to the particularities of the operation of partnerships under Connecticut law.

[10] Apparently, according to testimony from the pension consultant, Mr. Knight kept securities instead of cash in his account, and one security in which he invested experienced a spike in value that dramatically increased his cash balance.

[11] The pension consultant disavowed knowledge of the transfers, but one exhibit submitted at the hearing clearly shows Mr. Knight informing the consultant that he would "need to transfer one last item," referring to the Five Guys investment, and confirming that the transfer during March 2022 would be effective as of

9

It is also relevant to note that it appears the Plan overall was largely funded by Mr. Knight's personal contributions. A review of the Plan documents shows that every participant's hypothetical account balance was calculated using a stated pay credit and interest rate. The interest rate was 5.5% for all participants, but the pay credit varied by the class of participant. There were four classes: Mr. Knight was the sole participant classified as class "A," and he had a pay credit of $160,000; Mr. Rolleri was the sole participant classified as class "B," and he had a pay credit of $50,000; Mr. Sheppard was the only employee classified as class "C," and he had a pay credit of $0; and all other employees were classified as class "D" and had a pay credit of $800. The sum of the pay credit and the interest rate yielded an employee's hypothetical account balance, which in turn yielded that employee's accrued benefit. The Plan document obligates the "Employer" (a defined term which includes all the individuals party to this action) to continue to make annual contributions to the Plan as are necessary to maintain the Plan. The pension consultant (James Hallinan) testified that he did not know the specific amounts in any participant's hypothetical account; he only reviewed the Plan funding in the aggregate and informed Mr. Rolleri what amount was required to maintain the Plan. It is not clear how this obligation was paid; Mr. Knight testified that he contributed whatever amount Mr. Rolleri told him to, but there was no explanation of the specific funding mechanics, either under the Plan or the partnership agreement.

A review of certain exhibits presented during the hearing shows that, at least as of 2018, the vast majority of the Plan's assets were held in Mr. Knight's account. At the end of 2018, Mr. Knight's hypothetical account showed a balance of $2.3 million, but the total

---

January 1, 2022. The consultant replied, "[Y]es.[.] THKS[.]" That email apparently was forwarded to Mr. Rolleri the next day. Thus, this strongly indicates that none of these withdrawals was done clandestinely.

10

Plan assets equaled only about $2.5 million.  By the end of 2020, Mr. Knight's account (unbeknownst to him) already was overfunded, and no other participant had an account balance exceeding four figures except for Mr. Rolleri, whose hypothetical account contained approximately $280,000.  Mr. Rolleri admitted during his testimony that, being the only other participant with any appreciable amount of money in the Plan, he stood to gain the vast majority of the funds he asserts Mr. Knight is obligated to return.

On these facts, Plaintiffs are unable to show why Mr. Knight *would not* have been entitled to the assets he withdrew, notwithstanding the maximum benefit calculated pursuant to the Internal Revenue Code,[12] nor why *Plaintiffs* would have been any *more* entitled to those assets than was Mr. Knight.  They make no reference to statutory law, nor to the actual terms of the Plan itself to indicate the legal basis for their asserted entitlement to the withdrawn funds.  Defendants, to the contrary, have pointed to several parts of the Plan and of ERISA that present a colorable defense to Plaintiffs' claims.

At the hearing, defense counsel inquired of several witnesses as to certain terms of the Plan documents.  Section 5.3 of the Plan trust document clearly states that there can be no amendment to the trust giving the Employer any interest in the assets of a custodial account or giving the Employer any interest in a participant's nonforfeitable interest in those assets. [13]  The court further notes that the trust document also provides that the Trustee (a defined term, including all of the individual Plaintiffs and Defendants) shall invest money in Segregated Funds (another defined term, meaning funds held in the name of the Trustee, but segregated from the trust's general funds), and that such

---

[12] As discussed *infra*, it is not clear whether Mr. Knight still may have been able to withdraw the full amount in his account as long as he paid appropriate taxes and penalties on the overage.
[13] Datair Volume Submitter Cash Balance Trust, § 5.3.

11

segregated accounts shall be held "for the benefit of the [p]articipant for whom such Segregated Fund is established . . . and the [p]articipant's Segregated Fund shall be credited with any interest earned in connection with such accounts."[14]

Further, during cross-examination, Mr. Rolleri conceded that ERISA renders some of a participant's cash balance nonforfeitable, and that the Plan perhaps could have been amended to prevent Mr. Knight from being deprived of his nonforfeitable assets. Generally speaking, an employee with Mr. Knight's years of service would have been entitled by statute to a nonforfeitable benefit amount roughly equal to 100% of their hypothetical account balance, as it is calculated under the terms of the plan. *See* Notice 96-8, 1996-1 C.B. 359, 1996 WL 17901 ("Cash Balance Pension Plans", 1996-1 C.B. 359 (1996)); 26 U.S.C.A. § 411(a)(2).

It is unclear how this statute interacts with ERISA's maximum benefit provision, and with the terms of the Plan itself. And even if Mr. Knight withdrew more money than is permissible under tax law, it is not clear that he would have been prevented from withdrawing that money, entirely; it appears that in similar circumstances, retirement plan beneficiaries have been sanctioned with additional taxes and penalties, but not with complete confiscation of the funds.[15] *See, e.g., Pizza Pro Equip. Leasing, Inc. v. Comm'r of Internal Revenue*, 147 T.C. 394 (2016), aff'd, 719 F. App'x 540 (8th Cir. 2018) (finding additional excise taxes on excessive benefits and contributions to be a proper sanction).

Therefore, it is far from clear, even by a probable cause standard, that Mr. Knight stole anything from the Plan such that he could be found to have violated his fiduciary duty. From the testimony presented before the court, it appears that there was an error

---

[14] Datair Volume Submitter Cash Balance Trust, § 4.4.
[15] The court notes that it is also far from clear that this action would result in criminal penalties.

in overseeing the Plan's assets, that the error was at least partially correctible by certain actions, and that Mr. Knight took those remedial steps, apparently with the knowledge of Mr. Rolleri and of the pension consultant.

Each of the defendants and each of the individual plaintiffs simultaneously is an employer, trustee, fiduciary, and a participant under the Plan, and each has distinct rights and responsibilities in each role, under the contours of ERISA and the facts of this case. The interplay of these various roles is not entirely clear at this early stage of litigation. Plaintiffs' bare legal conclusion that Defendants stole from the Plan, absent any contractual or statutory basis for that conclusion, is insufficient to show probable cause.

Of course, Mr. Knight's actions may yet qualify as a breach of his fiduciary duty and as civil theft. But the court cannot, based on the current record, find that Plaintiffs have shown a reasonable expectation that they will recover any amount, much less over $4 million. Accordingly, the PJR Motion is denied.

Because the TRO Motion only asks for injunctive relief pending the disposition of the PJR Motion, and because the court has not found probable cause to grant a prejudgment remedy, the TRO Motion also is denied.

## IV. CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss, ECF Nos. 34 and 41, hereby is **GRANTED in part and is DENIED in part**.

    a. Plaintiff Rolleri &Sheppard CPAS, LLP is dismissed from this action.

    b. The Clerk of Court is asked, respectfully, to terminate Rolleri & Sheppard CPAS, LLP from this action.

2. The Motion for a Prejudgment Remedy hereby is **DENIED.**

3. The Motion for a Temporary Restraining Order hereby is **DENIED.**

    **IT IS SO ORDERED** at Hartford, Connecticut, this 20th day of September, 2023.

                                  /s/
                        OMAR A. WILLIAMS
                        UNITED STATES DISTRICT JUDGE